THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INTERNATIONAL BROTHERHOOD OF )
TEAMSTERS LOCAL NO. 710 HEALTH )
AND WELFARE FUND, and INTERNA- )
TIONAL BROTHERHOOD OF TEAM- )        1:14-CV-3915
STERS LOCAL NO. 710 PENSION FUND, )
                                  )
                    Plaintiffs,   )        Judge Zagel
                                  )
                                  )        Magistrate Judge Kim
          v.                      )
                                  )
ABF FREIGHT SYSTEM, INC., a Delaware )
Corporation,                      )
                                  )
                    Defendant.    )

## PLAINTIFFS-COUNTERDEFENDANTS' ANSWER TO COUNTERCLAIM

Now come the Plaintiffs-Counterdefendants, INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 HEALTH AND WELFARE FUND, and INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL NO. 710 PENSION FUND, by and through their Attorney, Robert B. Greenberg of Asher, Gittler & D'Alba, Ltd., and in answer to ABF FREIGHT SYSTEM, INC., a Delaware Corporation's Counterclaim, the Plaintiffs-Counterdefendants, (hereinafter "Funds") answer as follows:

1.    ABF Freight a subsidiary of ARC Best Corporation, is a Delaware corporation with its principal place of business in Forth Smith, Arkansas. ABF Freight is a global provider of customizable supply chain solutions, with services that include regional and national transportation of general commodities, and third-party logistics services such as brokerage, intermodal ocean transport, transportation management, warehousing, and household moving.

- 1 -

2. International Brotherhood of Teamsters Local No. 710 Health and Welfare Fund ("Health & Welfare Fund") is a multi-employer employee benefit plan, established under the Employee Retirement Income Security Act of 1974 ("ERISA"), whose participants include employees of ABF Freight.

3. International Brotherhood of Teamsters Local No. 710 Pension Fund ("Pension Fund) is a multi-employer employee benefit plan, established under ERISA, whose participants include employees of ABF Freight.

4. This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1331 and 2201, and 29 U.S.C. § 1132(a).

5. This Court has personal jurisdiction over Plaintiffs because Plaintiffs submitted themselves to the personal jurisdiction of this Court by commencing this action, and because Plaintiffs purposefully engaged in substantial activity in the State of Illinois related to this Counterclaim.

6. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs filed their Complaint in this District and thus have consented to venue in this Court, and because a substantial part of th events giving rise to the Counterclaim occurred in this District. Venue is also proper in this District under 29 U.S.C. § 1132(e)(2) as the Pension Fund and the Health & Welfare Fund are purportedly administered in this District.

The Funds admit the allegations as stated in Paragraphs 1 through 6 of the Counterclaim.

7.  ABF Freight brings this counterclaim to obtain a declaration from this Court that clarifies the appropriate standard that should apply in determining whether and in what circumstances ABF Freight owes any increased contributions to the Funds on behalf of ABF Freight employees who participate in the Funds, and a further declaration that the Funds have not met that standard in this case.

**RESPONSE NO. 7:**

The Funds neither admit nor deny the allegations of Paragraph 7, as the allegations portend to state the purpose for which ABF Freight brings its Counterclaim., and the Funds have no specific knowledge as to the rationale that ABF Freight has for bringing its Counterclaim.

8.  The Funds erroneously insist that under the ABF National Master Freight Agreement ("ABF NMFA" or "Agreement"), ABF Freight has an obligation "to contribute to the Funds the increased amount of one dollar per hour commencing on August 1, 2013, and monthly thereafter." Compl. Par. 7. However, the ABF NMFA provides that the Funds are entitled to an increase in contribution of "up to $1.00 per hour" per covered employee each year during the five-year lifetime of the Agreement *only if* the Funds can demonstrate that any such increase in the contribution rate is necessary to maintain the then-current level of benefits for that year. See Exhibit A, Art. 38, § 5.

**RESPONSE NO. 8:**

The Funds deny that they erroneously maintained that ABF Freight has an obligation to contribute to the Funds in the increased amount of $1.00 per hour as, in fact, it is the Funds' position that there is no error, but rather that ABF Freight is obligated to pay the Funds an additional $1.00 per hour per covered employee.

9.  **The Funds have not sufficiently supported their claim that it is "necessary" for ABF Freight to contribute an additional $1.00 to the Funds in order for the Funds to maintain benefits for the year starting August 1, 2013 and ending July 31, 2014. The February 7, 2014 letter from the Funds' actuary Thomas K. Hartman is the Funds' sole support for the requested increase and falls woefully short of the standard of evidence required by the ABF NMFA to justify any contribution rate increase.**

**RESPONSE NO. 9:**

The Funds deny that they have not sufficiently supported their claim, and deny that it is unnecessary for ABF Freight to contribute an additional $1.00 per hour to the Funds, and further deny that the February 7, 2014 letter from the Funds' Actuary, Thomas K. Hartman, is the Funds' sole support for the requested increase.

10. **Among other things, Mr. Hartman states that the Local 710 Health & Welfare Fund enjoyed an increase in net assets of $3,197,967 from February 1, 2012 through January 31, 2013. The letter further states that the Local 710 Pension Fund's accrued benefit fund ratio was 82.25% on January 31, 2013, which means that the Fund is non-endangered under the classification system set forth in the Pension Protection Act. Neither of these facts supports Mr. Hartman's conclusion that it is "necessary" for ABF Freight to increase its contributions (retroactively, in part) to the Funds in order for the Funds to maintain benefits at the August 1, 2013 level through July 31, 2014. To the contrary, the actuarial information provided**

by the Funds in Mr. Hartman's letter demonstrates that there is no need for any increased contribution. And that is confirmed by the more detailed information in the Form 5500s filed by the respective Funds with the U.S. Department of Labor. Indeed the Funds have offered no justification that would substantiate the need for any increase in contributions by ABF Freight.

**RESPONSE NO. 10:**

The Funds admit that Thomas Hartman's letter of February 7, 2014 was submitted in support of the requested increase by the Funds, as required by Article 38, Section 5, of the ABF NMFA Agreement. The Funds additionally deny that the actuarial information provided by the Funds in Mr. Hartman's letter, demonstrates that there is no need for an increased contribution, but the Funds' state in response thereto that, in fact, the information provided does show a need for increased contributions.

11. ABF Freight is entitled to a declaration that, under the terms of the ABF NMFA, the Funds must demonstrate through actuarial evidence that, unless ABF Freight makes the requested contributions to the Funds "up to $1.00," it is more likely than not that the Funds will be unable to make payments of benefits at current levels for the year August 1, 2013 to July 31, 2014. Because the Funds have not provided such evidence, ABF Freight is also entitled to a declaration that the Funds have not met the required standard.

**RESPONSE NO. 11:**

The Funds deny each and every allegation of Paragraph 11 of Defendant's Counterclaim.

12. ABF Freight employs approximately 13,000 people, including 7,000 drivers of the fleet of vehicles that ABF Freight uses to transport commodities for its customers. Nationwide, approximately 7,500 ABF Freight employees are members of local

unions affiliated with the International Brotherhood of Teamsters.

**RESPONSE NO. 12:**

The Funds neither admit nor deny the allegations of ABF Freight in Paragraph 12 of the Counterclaim, as it states facts that are solely within the knowledge of ABF Freight, and not within the knowledge of the Funds, as to the numbers of employees of ABF Freight, nor the number of drivers who are driving the fleet of vehicles that ABF Freight uses to transport commodities for its customers, nor do the Funds have knowledge as to the numbers of employees who are members of various local unions affiliated with the International Brotherhood of Teamsters, other than the Local 710 IBT.

13. **Local 710 of the International Brotherhood of Teamsters ("Local 710") was chartered on October 1, 1903 and is based in Mokena, Illinois. Its members include drivers of "less-than truckload" (or small-freight) carriers, including drivers employed by ABF Freight. Local 710 members, including ABF Freight employees, are participants in the Local No. 710 Health & Welfare Fund and its Pension Fund.**

**RESPONSE NO. 13:**

The Funds admit the allegations as set forth in Paragraph 13 of the Counterclaim.

14. **ABF Freight and the Teamsters National Freight Industry Negotiating Committee ("the Committee") are parties to the ABF NMFA, which governs the rights and responsibilities of ABF Freight employees who are members of local affiliates of the Teamsters. The Committee represents the Teamsters and its local union affiliates, including Local 710, in negotiations with ABF Freight. The current version of the Agreement is in effect from April 1, 2013 to March 31, 2018.**

**RESPONSE NO. 14:**

The Funds admit the allegations of Paragraph 14 of Defendant's Counterclaim, but deny that the Committee represents all of Local 710 in negotiations with ABF Freight.

15.     **Article 38, Section 5 of the ABF NMFA, titled "Health & Welfare and Pension Plans," provides that ABF Freight shall participate in the Local 710 Health & Welfare and Pension Funds, and provides the criteria by which ABF Freight may be expected to make contributions to those Funds. A true and correct copy of Article 38, Section 5 of the Agreement is attached to this Answer and Counterclaim as Exhibit A, and in incorporated by reference as if fully set forth herein.**

**RESPONSE NO. 15:**

The Funds admit that Article 38, Section 5 of the ABF NMFA provides that ABF Freight shall participate in the Local 710 Health & Welfare & Pension Funds, and provides some of the criteria by which ABF Freight may be expected to make contributions to the Funds.

16.     **In relevant part, Section 5 provides that, over the lifetime of the Agreement, ABF Freight shall make contributions to the respective Funds at the levels in effect on the date of ratification of the Agreement, and further provides that, "[i]f necessary to maintain the Health and Welfare and Pension benefits, [ABF Freight] shall increase its contribution to all Teamsters Health & Welfare and Pension Plans, up to $1.00 per year...." *Id.* (Emphasis added). The annual employer contribution is assessed for each hour worked by each Local 710 member employed by ABF Freight.**

**RESPONSE NO. 16:**

The Funds admit that Section 5 provides for the obligation of ABF Freight to make

contributions to the respective Funds at the levels in effect on the date of ratification of the Agreement, and further provides language to the effect that if necessary, the contributions shall be made to maintain the Health and Welfare and Pension Fund benefits, and that ABF Freight shall increase its contributions to all Teamsters Health & Welfare and Pension Funds up to $1.00 per year. It is to be noted that Section 5 also provides specifically therein, that the amounts to be paid are "<u>determined on an annual basis by the Funds to be necessary to maintain benefits then in effect</u>."

17.     The ABF NMFA further specifies that ABF Freight shall be responsible, if necessary to maintain benefits at the levels in effect as of August 1, 2013, for increasing the amount of its collective contributions to the two Funds "up to $1.00 per hour," which contribution level shall remain in effect until July 31, 2014. Then, BF Freight may be responsible, if necessary to maintain benefits at then-current levels, for contributing "up to an additional $1.00 per hour" each subsequent year over the lifetime of the Agreement, with each year starting on August 1, 2014, 2015, 2016, and 2017. The Agreement specifies, however, that "[t]he Employer shall only be required to pay portions of the 'up to' $100 per hour increases that are necessary to maintain the benefits as described above." Ex. A, Art. 38, § 5 (emphasis added).

<u>RESPONSE NO. 17:</u>

The Funds admit the allegations of Paragraph 17 as to the specifications contained within the ABF NMFA agreement.

18.     The ABF NMFA also provides that, "[c]onsistent with past practice under the [Agreement], the Supplemental Negotiating Committee will determine the allocation of the negotiated contribution amounts to the appropriate Health & Welfare and/or Pension Funds." Ex. A, Art. 38, § 5. The Supplemental

Negotiating Committee is a committee created by collective bargaining agreements each local Teamsters affiliate, wherein ABF Freight and the local union have equal voting power to resolve issues specific to that particular local union.

**RESPONSE NO. 18:**

The Funds admit the allegations of Paragraph 18 in that the ABF NMFA provisions are correctly cited.

19.    The ABF NMFA requires that, each year over the lifetime of the Agreement, each Fund must make, based upon actuarial evidence, a determination whether an increase over and above ABF Freight's contribution level to the Fund for the previous year is "necessary to maintain the benefits" owed to participants in the Fund for that year. Any such increases cannot exceed $1.00 total for both the Health & Welfare and Pension Funds combined.

**RESPONSE NO. 19:**

The Funds admits the allegations of Paragraph 19 in the Defendant's Counterclaim.

20.    For example, for the year starting on August 1, 2014 and ending July 31, 2015, if the Local 710 Health & Welfare Fund requested that ABF Freight contribute more than it did during the previous year (starting August 1, 2013 and ending July 31, 2014), it would need to demonstrate, through actuarial evidence, that the additional contribution was necessary for the Fund to provide participants with the benefit levels in effect on August 1, 2014 through to July 31, 2015.

**RESPONSE NO. 20:**

The Funds deny that the example in Paragraph 20 of the Counterclaim is relevant, and does

not necessarily appropriately state what the obligations would be for the year commencing August 1, 2014, ending July 31, 2015, as the time period involved herein is not the time period in the present action brought by the Funds.

21.  **Consistent with the parties' past practice, the Joint National Master Committee ("JNMC") has solicited from the administrator of each employee benefit plan covered by the Agreement information that would substantiate any requested increase in ABF Freight's contributions to the plan. The members of the JNMC are representatives of the two parties that negotiated and entered into the ABF NMFA. The members of the JNMC include Tyson Johnson, Co-Chairman of the Teamsters National Freight Industry Negotiating Committee and David Evans, ABF Freight's Vice President for Industrial Relations.**

RESPONSE NO. 21:

The Funds neither admit nor deny the allegations of Paragraph 21, as it has no knowledge as to the specific actions taken by the Joint National Master Committee, with respect to employee benefit funds other than the Local 710 Funds, nor do the Funds have specific knowledge as to who the members of the JNMC are at this time.

22.  **Upon receipt of information from each covered plan, the JNMC determines whether or not the information substantiates the request for an increased contribution. If the information is sufficient, the JNMC has consented to the increase and directed the appropriate Supplemental Negotiating Committee to make an allocation in the amount(s) justified by the plan(s)' actuarial date and analysis. If the information is insufficient to show that any increase is necessary, the JNMC has asked questions and requested further documentation from the appropriate plan.**

<u>**RESPONSE NO. 22:**</u>

The Funds neither admit nor deny the allegations of Paragraph 22 of the Counterclaim, as to what the JNMC does with information that it receives, nor how it determine whether or not the information substantiates requests for increased contributions, or determines whether or not the information is sufficient, and consents to the increase or denies that it is sufficient, and requests additional information. The Funds do admit, however, that additional information was requested from the Funds and that such information was, in fact, provided.

23. **By letter of January 10, 2014, the JNMC advised Brian J. O'Malley, Administrator of the Local 710 Health & Welfare and Pension Funds, as to its need to substantiate any increase in the contribution made to either the Pension Fund or the Health & Welfare Fund. A true and correct copy of that letter is attached to this Answer and Counterclaim as Exhibit B, and is incorporated by reference as if fully set forth herein.**

<u>**RESPONSE NO. 23:**</u>

The Funds admit that a letter dated January 10, 2014, was sent to Brian J. O'Malley, and admit that the letter speaks for itself.

24. **The January 10 letter from the JNMC informed the Funds that any request for a contribution rate increase had to be substantiated:**

   <u>**With those requests, please include an explanation as to why that increase is necessary to maintain benefits and include supporting data (e.g., actuarial/costing/professional reports etc.)**</u> In other words, health & welfare and pension funds seeking a contribution rate increase in a given year are requested reasonably to substantiate any claims that the requested amount is necessary to maintain benefits.

Ex. B (emphasis in original).

RESPONSE NO. 24:

The Funds admit the January 10 letter informed the Funds that the request for a contribution rate increase had to be substantiated. The Funds, in fact, substantiated the request by providing the information that was necessary to support its conclusion that additional contributions were necessary, and that the Funds determined, that the increases were necessary to maintain the benefits then in effect.

25.     The January 10 letter further explained the circumstances under which the funds would be entitled to receive any additional contribution for ABF Freight "up to $1.00" under the terms of the Agreement. The JNMC made clear that "<u>the various funds should not request more than that portion of the $1.00 per hour that is necessary to maintain benefits.</u>" Ex. B (emphasis in original).

RESPONSE NO. 25:

The Funds admit that the January 10 letter was received, and that the letter speaks for itself.

26.     In May 2014, the JNMC advised those funds that had not responded to its initial request for information that the funds must "provide an explanation as to why [any] increase is necessary to maintain benefits at the current level for the next year."

RESPONSE NO. 26:

The Funds neither admit nor deny the allegations of Paragraph 26, as the Funds do not have any knowledge as to which Funds had not responded to the initial request for information, but states that the Local 710 Funds did respond by providing the information it believed was specifically requested and which substantiated the increase due the Funds.

27.     The January 10, 2014 and May 2014 letters demonstrate that the parties to the ABF NMFA, whose representatives sit on the JNMC, understand that the Agreement requires a showing by the Funds that any increased contribution must be necessary to maintain benefits for the one-year period covered by the requested increase.

**RESPONSE NO. 27:**

The Funds neither admit nor deny the allegations in Paragraph 27 of the Counterclaim, as the Funds have no knowledge as to what the parties to the ABF NMFA agreement understood.

28.     In its January 10 letter to the Funds, the JNMC further stated that "[a]s has been the practice, each pension fund must provide notification of whether it has been or will be certified by the fund's actuary as critical ('red zone') as defined in ERISA, Section 305, between August 1, 2013 and July 31, 2014," Ex. B. The letter explained that "[i]f a fund has not been certified as critical, it must indicate whether it has been certified as endangered ('yellow zone') or no zone ('green zone')." *Id.*

**RESPONSE NO. 28:**

The Funds admit that the January 10 letter had provisions therein which are correctly stated in Paragraph 28 of the Counterclaim, but the Funds deny any characterization of the provisions cited (for example, green means financially stable).

29.     ERISA Section 305, enacted as part of the Pension Protection Act of 2006, created "zones" to describe the financial health of multi-employer pension plans based on the plans' funding levels and projections as to if and when the plans are likely to experience funding deficiencies. Pursuant to ERISA Section 305 and common

parlance, pension plans that are financially stable are placed in the "green zone," plans that are experiencing financial difficulties are placed in the "yellow zone," or on "endangered status," and plans facing severe funding problems are placed in the "red zone," or in "critical status."

**RESPONSE NO. 29:**

The Funds admit that the provisions as cited in Paragraph 29 of the Counterclaim are true and correct. However, it should also be noted, with respect to the Pension Fund, if the contribution rate of $401.00 is not paid, then those contributions are paid under benefit level 2, rather than benefit level 1. The benefit rate for benefit level 1 is $114.00. The maximum benefit rate for contributions under $401.00 would be $99.00. In 2014, a contribution rate of $421.00 is required; otherwise, the benefits would be paid under benefit level 2 and thus, unless the contribution increase, as demonstrated by the Fund Actuary, the benefits in effect for ABF Freight participants, which have always been at the highest benefit level, will not be maintained. See Amendment No. 4 to the International Brotherhood of Teamsters Union Local No. 710 Pension Fund Plan, a copy of which is attached hereto and made a part hereof as Exhibit "A."

30.    On February 12, 2014, counsel to the trustees of the Funds responded to the JNMC. A true and correct copy of that response letter is attached to this Answer and Counterclaim as Exhibit C, and is incorporated by reference as if fully set forth herein.

**RESPONSE NO. 30:**

The Funds admit that Counsel to the Trustees' Funds responded to the JNMC on February 12, 2014, and that a true and correct copy of that response is attached to the Answer and Counterclaim.

31. In that letter, the Funds acknowledged that they were entitled to an increase in ABF Freight's contribution rate *only* if they could substantiate that the increase was necessary to maintain benefits. To that end the Funds stated that they had "obtained from the Funds' enrolled actuary an examination of the funding status of the Funds as it relates to the maintenance of the Funds' benefits for covered employees," and enclosed a copy of a letter from the actuary that purported to support a contribution "increase of $1/per hour, allocated 50%-50% between the Funds, retroactive to August 1. Ex. C. A true and correct coy of the actuary's letter explanation is attached to this Answer and Counterclaim as Exhibit D, and is incorporated by reference as if fully set forth herein.

## RESPONSE NO. 31:

The Funds deny the allegations of Paragraph 31 in that the paragraph states that the Funds' Counsel, in its letter of February 12, stated or acknowledged that the Funds were entitled to an increase in the ABF Freight contributions rate <u>only</u> if they could substantiate the increase was necessary to maintain benefits. Nowhere in the letter is the word "<u>only</u>" in that letter, and to that extent the Funds deny each and every allegation of Paragraph 31.

32. The actuarial letter submitted by the Funds' trustees was authored by Thomas K. Hartman, of Hartman & Associates ("Hartman"), and the analysis filled less than one full page of text.

## RESPONSE NO. 32:

The Funds admit that an actuarial letter was submitted by the Funds' Trustees, and was authored by Thomas K. Hartman of Hartman & Associates. However, the Funds deny that the analysis filled less than one full page of text, in that there was a second page of text as well.

33.    Hartman explained that he had "reviewed the Pension and Health & Welfare Funds to advise on the necessity and allocation of the additional contributions under the fringe benefit contribution agreement." Ex. D.

## RESPONSE NO. 33:

The Funds admit the allegations of Paragraph 33 of the Counterclaim.

34.    Hartman concluded that "[d]ue to the current funding positions of the Pension Fund and the Health and Welfare Fund, it is necessary to use the full $1.00 fringe benefit for the funds." *Id.* He recommended that "the $1.00 per be split equally between the Pension Fund and the Health and Welfare Fund, retroactively to August 1, 2013." *Id.*

## RESPONSE NO. 34:

The Funds admit the allegations of Paragraph 34 of the Counterclaim, and state that the letter stands for itself.

35.    None of the actual evidence cited in Hartman's letter supports the conclusion that it is necessary for ABF Freight to increase its contributions to either Fund by any amount, let alone an additional dollar per hour to maintain benefits for the year August 1, 2013 to July 31, 2014. Nor does Hartman's letter provide any facts or analysis in support of his conclusion that the proposed $1.00 per hour contribution should be allocated evenly between the Pension Fund and the Health and Welfare Fund.

## RESPONSE NO. 35:

The Funds deny each and every allegation of Paragraph 35 of the Counterclaim.

36.     With respect to the Health & Welfare Fund, Hartman states that, from February 1, 2012 through January 31, 2013, plan assets increased by $3,197,967, "primarily due to a net appreciation in the fair value of investments of $2,667,274." Ex. D. The Health & Welfare Fund's Form 5500, filed with the U.S. Department of Labor ("DOL"), similarly shows that as of January 31, 2013, the Fund had net assets (or surplus) of $74.3 million, representing an increase of approximately $3.3 million from the surplus in place on January 31, 2012 ($71.0 million).

**RESPONSE NO. 36:**

The Funds admit the allegations of Paragraph 36 as to facts stated in the Hartman letter.

37.     Hartman's letter contains no information or analysis concerning the assets of the Health & Welfare Fund from February 1, 2013 to January 31, 2014.

**RESPONSE NO. 37:**

The Funds admit the allegations of Paragraph 37 of the Counterclaim, but the Funds deny any implication that the $1.00 increase was not necessary to maintain benefits.

38.     Hartman's letter does not explain how his chosen timeframe could demonstrate whether and to what extend an increased contribution from August 1, 2013 to July 31, 2014 would be necessary to maintain plan benefits during that period.

**RESPONSE NO. 38:**

The Fund admit the allegations of Paragraph 38, and state that the Hartman letter speaks for itself, but the Funds deny any implication that the $1.00 increase was not necessary to maintain benefits.

39.     A net appreciation of a health and welfare plan's assets does not and cannot support a request for an increased contribution from an employer.

**RESPONSE NO. 39:**

The Funds deny the allegations of Paragraph 39 of the Counterclaim.

40.     On information and belief, the Health & Welfare Fund's assets further increased from February 1, 2013 to the present. On information and belief, this increase was attributable in part to appreciation in the fair value of the Fund's investments, due to the rise in stock prices on major stock indexes during that period.

**RESPONSE NO. 40:**

The Funds neither admit nor deny the allegations of Paragraph 40 of the Counterclaim in that, it is just as possible that the Fund's assets decreased rather than increased as a result of losses on some of the Fund's investments, notwithstanding the rise in stock prices on the major stock indexes during the period from February 1, 2013 to the present, and the information and belief as stated herein is purely speculative.

41.     The S&P 500 index increased in value by approximately 17.8% from February 1, 2013 to January 31, 2014, and the Russell 2000 index increased in value by approximately 24.1% over the same time period. On information and belief, a prudently managed employee benefit plan with a diversified portfolio of assets would also have increased in value in 2013. As an actuary, Hartman should have known that the Health & Welfare Fund's assets would likely have increased in 2013.

**RESPONSE NO. 41:**

The Funds deny each and every allegation of Paragraph 41 in that the information contained therein is purely speculative, other than the fact that the S&P index increased in value, and any guess as to what Actuary Hartman should have known or did know is,

again, purely speculative and without any foundation.

42.     On information and belief, and based on data from the Health & Welfare Fund's
        Form 5500, without any further contributions whatsoever from ABF Freight, the
        net assets available in the Fund as of January 31, 2013 would have been sufficient
        to pay benefits at then-current levels for approximately 18 additional months.
        Also, in information and belief, if ABF Freight simply maintained its current
        contribution levels (without any increases), the Fund would have sufficient assets
        to pay benefits at current levels over the entire lifetime of the current ABF NMFA
        In these circumstances, Hartman's letter does not and cannot explain why it is
        "necessary" for ABF Freight to make its *present* levels of contributions to
        maintain benefits from August 1, 2013 to July 31, 2014, let alone why it would be
        necessary for ABF Freight to *increase* its contributions to maintain benefits over
        that time period.

**RESPONSE NO. 42:**

The Funds neither admit nor deny the allegations of Paragraph 42 in the Counterclaim, as
the allegations are based on pure speculation and are not based on any facts within the
purview of the Funds' knowledge. The Funds further state that the allegations of
Counterclaim Paragraph 42 overlook the many factors which are used to determine the
financial stability of a Health and Welfare Fund, factors which are solely to be determined
by the Fund's Trustees pursuant to their authority and duties under the Restated Trust
Agreement.

43.     With respect to the Pension Fund, Hartman's letter states that the Fund's accrued
        benefit funding ratio was 82.25% on January 31, 2013. Under the Pension
        Protection Act, plans that maintain an accrued benefit fund ratio of 80% or higher
        merit a non-endangered classification, *i.e.*, a financially stable fund. Hartman

correctly concludes that the Fund's 82.25% accrued benefit funding ratio "puts the fund in non-endangered status."

**RESPONSE NO. 43:**

The Funds deny that Hartman's determination, that the Fund's accrued benefit ratio was 82.25% but, rather, states that Hartman determined the ratio to be 79.06%, based on the market value rather than the actuarial value asset value.

44. Hartman states that if the market value of assets was used in the accrued benefit funding ratio calculation (instead of the actuarial asset value), the ratio would be 79.06%. Hartman does not explain, however, why market value is a superior method for valuing the Fund's assets than actuarial value, nor does he explain whether and why a 79.06% funding ratio would justify a $0.50 increased contribution to the Pension Fund.

**RESPONSE NO. 44:**

The Funds admit the allegations of Paragraph 44 of the Counterclaim. However, it is clear from Hartman's letter that he considered market value rather than actuarial value to be the appropriate value to determine the funding ratio.

45. Moreover, while Hartman indicates that the difference between the actuarial and market value of the Funds' assets is due to "unrecognized investment losses," he does not state whether any of those investment losses had been reversed in the Fund year February 1, 2013 to January 31, 2014.

**RESPONSE NO. 45:**

The Funds admit that Hartman's letter discusses the difference between actuarial and

market value of the Funds' assets was due to unrecognized investment losses. The Funds further admit that Hartman does not state in his letter as to whether any of the investment losses had been reversed in the Fund year, February 1, 2013 to January 31, 2014, nor does he indicate in the letter that the investment losses had not been reversed during that time period.

46. **Hartman does not explain why the current level of assets in the Pension Fund, which places the Fund in the "green" or non-endangered zone, is not sufficient to maintain pension benefits at the August 1, 2013 level through July 31, 2014.**

**RESPONSE NO. 46:**

The Funds deny that Hartman does not explain why the current level of assets in the Pension Fund is not sufficient, as Hartman clearly stated, that the market value of the assets used in the accrued benefit funding ratio calculation would be 79.06% and, as such, apparently in his opinion, is sufficient to take the Pension Fund out of the "green" or non-endangered zone.

47. **According to the Form 5500 filed by the Pension Fund with the DOL, from February 1, 2012 to January 31, 2013 (the same timeframe in which Hartman analyzed the Health & Welfare Fund), the market value of the Pension Fund increased by approximately $116 million and the actuarial value of the Pension Fund increased by approximately $40 million. Hartman does not mention these increases, nor does he explain why the assets in the Pension Fund (increases included) were insufficient to maintain benefits for current members for the year August 1, 2013 through July 31, 2014. Hartman is noted on the Pension Fund's Form 5500 as the "enrolled actuary" for the Fund.**

**RESPONSE NO. 47:**

The Pension Fund admits filing a Form 5500 with the DOL, covering the period from

February 1, 2012 to January 31, 2013. However, it is to be noted that the Form is not attached to the Counterclaim, and it is the Funds' position that the Form speaks for itself and, if it is accurately quoted by the Counterclaimant, then the Fund will admit that is the case. However, until such time as the Form is produced, the Fund does not admit the allegations pertaining thereto.

48.     As noted above, the S&P 500 index increased in value by approximately 17.8% from February 1, 2013 to January 31, 2014, and the Russell 2000 index increased in value by approximately 24.1% over the same time period. On information and belief, the assets of a prudently managed employee benefit plan with a diversified portfolio of investments would also have increased in value in 2013. As an actuary, Hartman should have known that the Pension Fund's assets would likely have increased in 2013.

RESPONSE NO. 48:

The Funds deny each and every allegation of Paragraph 48, in that it is not relevant to the case at hand, and it is based on pure conjecture of the Counterdefendant.

49.     According to the Pension Fund's Form 5500, for the period February 1, 2012 to February 1, 2013, employer contributions to the Pension Fund totaled approximately $116.44 million, as certified by the Plan's actuary. Utilizing other information from the funding standard account on Schedule MB, contributions with interest totaled approximately $118 million. Benefit accruals for the same time period were approximately $21 million (or approximately $23 million, adjusted for interest). That means that ABF Freight's current contribution levels fully funded benefits for the year beginning February 1, 2012 and ending February 1, 2013, with approximately $95 million remaining to be applied against the Fund's unfunded liabilities.

## RESPONSE NO. 49:

The Funds neither admit nor deny the allegations of Paragraph 49, as the Form 5500 has not been attached, and it is the Funds' position that the Form speaks for itself, and the information in the Form may or may not be accurately reflected by the statements in Paragraph 49 of the Counterclaim, and further the statement as to the meaning of the current contribution levels of ABF Freight is purely conjecture and without merit.

50.     **Hartman's letter indicates that the Pension Fund had a "funding period of 8.3 years which is based on a 7.75% interest rate assumption." Ex. D. This means that Hartman has concluded that, at current contribution levels, and assuming a 7.75% interest rate, the Pension Fund could continue to pay benefits at current levels, cover newly accruing benefits, and amortize all unfunded liabilities within 8.3 years.**

## RESPONSE NO. 50:

The Funds admit that Hartman's letter states that the Pension Fund has a "funding period of 8.3 years which is based on a 7.75% interest rate assumption." Other than admitted herein, the Funds deny the statement as to what Hartman's conclusions are, as such statement is purely speculative.

51.     **Hartman's letter does not explain why additional funding would be necessary to ensure funding of unfunded liabilities over the 8.3 year time period, let alone to maintain current benefit levels for the one-year time period August 1, 2013 to July 31, 2014. Hartman's letter also does not explain why the unfunded liabilities of the Pension Fund should be funded more rapidly than over 8.3 years when the 8.3 year funding pace exceeds any IRS requirements.**

## RESPONSE NO. 51:

The Funds deny that Hartman's letter does not explain why the additional funding would be necessary.

52. Based on the observed increase in Plan assets during the most recent year covered by the Pension Fund's Form 5500, the reasonable assumption that the Plan's value continued to increase in 2013, and the conclusion that the Fund could at current contribution levels pay benefits and amortize unfunded liabilities over 8.3 years, there would be no need for ABF Freight to make additional contributions for the time period August 1, 2013 to July 31, 2014 in order for the Pension Fund to maintain benefits, to maintain solvency, to meet minimum required contributions, and to stay in the "green" (non-endangered) zone under the Pension Protection Act.

**RESPONSE NO. 52:**

The Funds deny each and every allegation of Paragraph 52 of the Counterclaim, and further state that "Based on the observed increase" is purely speculative, as there are no proofs submitted regarding said increase in Plan assets, nor is any discussion relevant to increases in Plan's liabilities during the period of time covered.

53. At minimum, for the Funds to meet their obligations under the ABF NMFA to show that an increased employer contribution is "necessary to maintain benefits," the Funds must show through actuarial data that it is more likely than not that a Fund will be unable to make payments of benefits at current levels for the following year if the employer fails to make the requested contributions.

**RESPONSE NO. 53:**

The Funds deny each and every allegation of Paragraph 53 of the Counterclaim and state that in effect, the actuarial response by Actuary Thomas Hartman was sufficient, along with the fact that Section 5 of Article 38 specifically provides, "the rates being paid as of the date of the ratification of the ABF NMFA to the appropriate Health and Welfare and Pension Funds in such amounts as are determined on an annual basis by the Funds to be

necessary to maintain the benefits then in effect." In the instant case, the Trustees of the Funds determined the amounts that are necessary on an annual basis to be contributed to the Funds in order to maintain the benefits then in effect require an additional $1.00 per hour to the rate paid by ABF Freight effective August 1, 2013. The Funds further state that ABF Freight seeks to establish a standard for determining what "maintain the benefits" means, which is nowhere to be found in the ABF NMFA agreement and, in fact, such a determination is left to the Funds.

54. **Moreover, the data in the Form 5500 filed by the respective Funds with the U.S. Department of Labor for the plan year ending January 31, 2013, affirmatively demonstrates that both Funds are in sound financial condition and that *no* increase of *any* amount is necessary to maintain the level of benefits in effect on August 1, 2013 through July 31, 2014.**

RESPONSE NO. 54:

The Funds deny each and every allegation of Paragraph 54 of the Counterclaim.

55. **The actuarial evidence cited in Hartman's February 7, 2014 letter falls far short of substantiating his conclusions that it is "necessary" for ABF Freight to make any additional contributions, let alone an additional $1.00 per hour in contributions, in order to maintain benefits paid by the Funds for the time period August 1, 2013 to July 31, 2014. Nor does Hartman's letter provide any evidence that could support an allocation of $0.50 per hour to the Health and Welfare Fund or $0.50 per hour to the Pension Fund.**

RESPONSE NO. 55:

The Funds deny each and every allegation of Paragraph 55 of the Counterclaim.

56.     ABF Freight repeats and re-alleges each of the foregoing paragraphs as though fully set forth herein.

**RESPONSE NO. 56:**

The Funds repeat and reallege each of the foregoing answers to the Counterclaim as though fully set forth herein.

57.     An actual controversy exists between ABF Freight and Plaintiffs. The Funds erroneously maintain that ABF Freight has failed to make contributions allegedly required under the terms of the ABF NMFA, which has created a definite and concrete dispute between the parties, who have adverse legal interests. The parties' dispute is real and substantial, and calls for a decree of conclusive character.

**RESPONSE NO. 57:**

The Funds admit that there is a controversy existing between ABF Freight and the Funds, but deny that the Funds have erroneously maintained that ABF Freight has failed to make the contributions required under the terms of the ABF NMFA.

58.     The substantial controversy between ABF Freight and Plaintiffs is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A judicial declaration is necessary to settle this dispute and to clarify the parties' respective rights.

**RESPONSE NO. 58:**

The Funds deny that the Counterclaim filed by ABF Freight is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

59. Plaintiffs have not met their obligation under the ABF NMFA. In particular, Plaintiffs have not demonstrated that it is necessary for ABF Freight to make increased contributions to the Funds for the Funds to maintain their current level of benefits for the year starting on August 1, 2013 and ending July 31, 2014.

RESPONSE NO. 59:

The Funds deny that they have not met the obligation under the ABF NMFA, and that they have failed to demonstrate that it is necessary for ABF Freight to make the increased contributions claimed to be due and owing in the Complaint. The Funds further assert, that they have met the obligations under the ABF NMFA agreement, by showing that the $1.00 increase was determined by the Funds' Trustees to be necessary to maintain benefits.

60. In addition, Plaintiffs have not demonstrated the necessity of an increased annual contribution of $0.50 per hour for the Health & Welfare Fund or $0.50 per hour for the Pension Fund.

RESPONSE NO. 60:

The Funds deny that they have not demonstrated the necessity of an increased annual contribution of $0.50 per hour for the Health & Welfare Fund, and/or $0.50 per hour for the Pension Fund.

61. ABF Freight is entitled to a declaratory judgment of its rights, specifically that, under the ABF NMFA, Plaintiffs must show through actuarial data that it is more likely than not that the Pension Fund and/or the Health & Welfare Fund will be unable to make payments of benefits at current levels for the following year if ABF Freight does not make the requested increase in contribution.

RESPONSE NO. 61:

The Funds deny that ABF Freight is entitled to a declaratory judgment, and further deny

that it is the Funds' obligation to show through actuarial data that it is more likely than not that the Pension Fund and/or Health & Welfare Fund will be unable to make payments of benefits at the current levels if ABF Freight does not make the required increase in contribution.

62. **ABF Freight is further entitled to a declaratory judgment that Plaintiffs have failed to make and cannot make the required showing in this case, and therefore, that ABF Freight does not need to make an increased contribution to the Funds for the year starting August 1, 2013 and ending July 31, 2014.**

<u>RESPONSE NO. 62:</u>
The Funds deny each and every allegation of Paragraph 62.

WHEREFORE, the Funds/Counterdefendants, pray that the Counterclaim be dismissed or, in the alternative, that judgment be entered thereon in favor of the Funds/Counter-defendants.

Respectfully submitted,

/s/ Robert B. Greenberg
Asher, Gittler & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois 60606
(312) 263-1500
Fax: (312) 263-1520
rbg@ulaw.com
IL ARDC#: 01047558

AMENDMENT No. 4

## THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
## UNION LOCAL NO. 710 PENSION FUND PENSION PLAN

**BE IT RESOLVED** that subject to qualification with the U.S. Treasury Department, the International Brotherhood of Teamsters Union Local No. 710 Pension Plan be amended as follows

1. **That Schedule A – Contribution Rate required for Benefit Level 1 be amended as shown in the attached Schedule A.**

2. **That Schedule B – Benefit Level 2, Contribution Rate & Benefit Schedule be amended as shown in the attached Schedule B.**

**IN WITNESS WHEREOF,** the undersigned Trustees have caused this Resolution to be executed on the dates appearing opposite their respective names.

Employer Trustees:

_[signature]_ _12/19/13_
Date

_[signature]_ _12/19/13_
Date

_[signature]_ _12/19/13_
Date

Union Trustees:

_[signature James E. Daures]_ _12-19-13_
Date

_[signature Patt W. Flynn]_ _12-19-13_
Date

_[signature]_ _12-19-13_
Date

_Exh. "A"_

# LOCAL UNION NO. 710 PENSION FUND

## CONTRIBUTION RATE REQUIRED FOR BENEFIT LEVEL 1

| Calendar Year | Weekly Contribution Rate |
|---------------|--------------------------|
| 2011 | at least $349.00 |
| 2012 | at least $375.00 |
| 2013 | at least $401.00 |
| 2014 | at least $421.00 |

Note:  The weekly contribution is the first contribution received by the Trust Fund on behalf of the Employee or Participant in the Calendar Year.

# LOCAL UNION NO. 710 PENSION FUND

## BENEFIT LEVEL 2

## CONTRIBUTION RATE & BENEFIT SCHEDULE

| Calendar Year | Weekly Contribution Rate From… | | ….To | Benefit Amount |
|---|---|---|---|---|
| 2011 | $66.00 | - | $104.99 | $21.00 |
| | 105.00 | - | 130.99 | 33.00 |
| | 131.00 | - | 156.99 | 41.00 |
| | 157.00 | - | 208.99 | 50.00 |
| | 209.00 | - | 261.99 | 66.00 |
| | 262.00 | - | 313.99 | 83.00 |
| | 314.00 | - | 348.99 | 99.00 |
| 2012 | $71.00 | - | $112.99 | $21.00 |
| | 113.00 | - | 140.99 | 33.00 |
| | 141.00 | - | 168.99 | 41.00 |
| | 169.00 | - | 224.99 | 50.00 |
| | 225.00 | - | 280.99 | 66.00 |
| | 281.00 | - | 337.99 | 83.00 |
| | 338.00 | - | 374.99 | 99.00 |
| 2013 | $40.00 | - | $75.99 | $11.00 |
| | 76.00 | - | 119.99 | 21.00 |
| | 120.00 | - | 149.99 | 33.00 |
| | 150.00 | - | 179.99 | 41.00 |
| | 180.00 | - | 239.99 | 50.00 |
| | 240.00 | - | 299.99 | 66.00 |
| | 300.00 | - | 360.99 | 83.00 |
| | 361.00 | - | 400.99 | 99.00 |

| 2014 | $43.00 | $80.99 | $11.00 |
|------|--------|--------|--------|
|      | 81.00  | 126.99 | 21.00  |
|      | 127.00 | 156.99 | 33.00  |
|      | 157.00 | 191.99 | 41.00  |
|      | 192.00 | 252.99 | 50.00  |
|      | 253.00 | 317.99 | 66.00  |
|      | 318.00 | 378.99 | 83.00  |
|      | 379.00 | 420.99 | 99.00  |

Note:  The benefit amount is based on a weekly contribution rate first received by the Trust Fund on behalf of the Employee or Participant in the Calendar Year.

## CERTIFICATE OF SERVICE

ROBERT B. GREENBERG, being duly sworn, says that he is an Attorney associated with Asher, Gittler & D'Alba, Ltd., Attorneys for Plaintiffs and Counterdefendants in this action, and that he served the attached Answer to Counterclaim upon:

> **Mary Margaret Moore**
> **Bryan Cave LLP**
> **161 North Clark Street, Suite 4300**
> **Chicago, IL   60601**
>
> **William J. Kilberg, P.C.**
> **Paul Blankenstein**
> **Thomas M. Johnson, Jr.**
> **Ashley S. Boizelle**
> **Gibson Dunn & Crutcher LLP**
> **1050 Connecticut Ave., N.W.**
> **Washington, D.C.   20036**

by depositing a copy in the United States mails, postage paid, at 200 West Jackson Boulevard, Chicago, Illinois 60606, on the 21st day of July, 2014.

Service was accomplished pursuant to ECF as to Filing Users, and Counsel shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

> /s/ Robert B. Greenberg
> Asher, Gittler & D'Alba, Ltd.
> 200 West Jackson Boulevard, Suite 1900
> Chicago, Illinois 60606
> (312) 263-1500
> Fax: (312) 263-1520
> rbg@ulaw.com
> IL ARDC#:  01047558